UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BELL MICROPRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:06-CV-082 CAN |
| | ) | |
| MARKET DEVELOPMENT | ) | |
| SPECIALISTS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

**I.    INTRODUCTION**

At first blush this case seems simple and straightforward.  The Defendant Market Development Specialist, Inc. (Market) ordered and received products from the Plaintiff, Bell Microproducts, Inc. (Bell), for which it did not pay.  As to this fact, all parties agree.  The law generally requires one to pay for the goods and services for which one has contracted.  But now the case becomes more complicated.  Defendants John Levy (Levy) and Romaine Inc. (Romaine) executed guarantiess for the debt of Market.  Bell, having exhausted its patience for payment, filed suit on January 31, 2006, against Market, Levy, and Romaine, alleging a host of contract theories, both express and implied.  The Defendants answered with both legal and equitable defenses as well as a counter claim.  Specifically, Market alleges that Bell breached its contract with regards to certain purchase orders, violated warranties, and interfered with certain business relationships.  The Court will now sort through the arguments and determine which issues it may properly rule upon and which issues must be determined by a jury.

## II.   PROCEDURE

On June 7, 2006, this case was reassigned to the undersigned based on the consent of the parties.  On November 12, 2007, Bell filed a motion for summary judgment as to all of its claims and as to Market's counterclaims.  Defendants filed a joint response to Bell's motion on December 17, 2007.  On January 4, 2008, Bell filed a reply in support of its motion.  On that same day, Bell also filed a motion to strike portions of Defendants' exhibits submitted in opposition to Bell's motion pursuant to Fed. R. Civ. P. 56.  On May 1, 2008, this Court held oral arguments on the motions.  This Court may rule upon these motions pursuant to the parties' consent and 28 U.S.C. § 636(c)(1).  The Court now enters the following opinion and order regarding all pending matters.

## III.   THRESHOLD ISSUES

### A.   Bell's Motion to Strike

Bell seeks to strike portions of the Levy affidavit and deposition testimony pursuant to Fed. R. Civ. P. 56(e).  The Defendants, however, never filed an opposition to Bell's motion to strike.  The Court can only conclude that the Defendants do no oppose the motion to strike.  Consequently, Bell's unopposed motion to strike portions of Levy's affidavit is **GRANTED**.  All or portions of paragraphs 8, 10,11, 13, 15, 16, 17, 19, 22, 25, 26, 27, 28, 29, 33, 34, 35, 36, 38, 39, and 42 of the Levy affidavit are **STRICKEN**.  Also, Defendants' Exhibit D, pages 8, 9, 15, 16, 30-36, 45-48, 55-56, and Defendants' Exhibit E, pages 139-140, 236-242, 245-249, are also **STRICKEN**.

### B.   Waiver

Bell argues that Romaine has waived the affirmative defenses of failure of consideration with regard to the Romaine Guaranty.  Under Fed. R. Civ. P. 8(c), "a party must affirmatively state any avoidance or affirmative defense."  If a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived.  Castro v. Chi. Housing Authority, 360 F.3d 721, 735 (7th Cir. 2004).  Romaine did not raise the affirmative defense of "lack of consideration" in its May 4, 2006, answer.  Consequently, this Court considers that argument **WAIVED**.

Bell also argues that Market waived the affirmative defense of setoff.  Market did not specifically plead an affirmative defense of "setoff," but it did file a counterclaim with its answer.  One of Market's counterclaims is that Bell committed a breach of warranties, which is the basis for its setoff arguments.  Under Fed. R. Civ. P. 8(c)(2), "[i]f a party mistakenly designates a defense as a counterclaim, . . . the court **must**, if justice requires, treat the pleading as though it were correctly designated. . . ."  (emphasis added).  Consequently, this Court does not find that Market waived the affirmative defense of "setoff."

C.    Choice of Law

"A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits," which includes the state's conflict rules.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Land v. Yamaha Motor Corp., 272 F.3d 514, 516 (7th Cir. 2007); Carolina Cas. Ins. Co. v. Estate of Zinsmaster, 2007 WL 3232461 at *2 (N.D. Ind. 2007).

Under Indiana law, contractual stipulations as to governing law are favored.  Allen v. Great American Reserve Ins. Co., 766 N.E.2d 1157, 1162 (Ind. 2002).  Parties may generally choose the law that will govern their agreements.  Hoehn v. Hoehn, 716 N.E.2d 479, 484 (Ind.

Ct. App. 1999). Where the parties have not made an effective choice of law, Indiana's choice of law rule for contract actions calls for applying the law of the forum with the most intimate contacts to the fact.  American Employers Ins. Co. v. Coachmen Industries, Inc., 838 N.E.2d 1172, 1178 (Ind. Ct. App. 2005); Bedle v. Kowars, 796 N.E.2d 300, 302 (Ind. Ct. App. 2003).

In the present case, with the exception of the Intercreditor Agreement, the written contracts between Bell and Market as well as the guaranties of Levy and Romaine contain clauses that indicate that they shall be governed by and construed in accordance with California law (Levy Guaranty ¶ 12; Romaine Guaranty ¶ 11; Lockbox Agreement ¶ 11.2; Remittance Agreement ¶ 11.2).  Not only are such contractual stipulations favored in Indiana, but it is clear that the parties intended California law to apply.  And if that were not sufficient, counsel agreed at the oral argument that California law applies.  Consequently, this Court will apply California contract law.

**IV.**    **ANALYSIS**

A.    Facts

The following facts are either undisputed or construed most favorably to the non-movants, Defendants, in accordance with Fed. R. Civ. P. 56 and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Bell is a corporation organized and existing under the laws of California that manufactures and distributes electronic components, computers, and other related products (Pl. Compl. at 3).  Market manufactures computers and computer products for sale to various entities (Id.).  Since at least 2004, Market and Bell have been involved in business transactions where Bell would provide Market with electronic parts, and in exchange, Market would pay Bell for

those parts and sell those parts, either individually or as part of something else, to customers (Plaintiff's Exhibit F, "Remittance Agreement; Defendant's Exhibit B, "Lock Box Agreement").

By June 17, 2004, Market owed Bell a sum of money for products. The parties entered into a contract titled the "Lockbox Agreement" (Def's Ex. F). Pursuant to the Lockbox Agreement, Bell continued to agree to sell products to Market in exchange for Market placing the collection of certain funds from its customers in a bank account, or "Lockbox" (Id.). Romaine, a non-party to this contract, also executed a written guaranty on June 17, 2004 (Plaintiff's Exhibit C, "Romaine Guaranty). Romaine guarantied the payment of all of Market's indebtedness to Bell (Id.).

During the fall of 2004, Market continued to place orders with Bell, and Bell filled some of those orders (Plaintiff's Exhibit A, Affidavit of David Uranga at ¶ 8). Sometime in November of 2004, Levy also signed a guaranty for Market's debts to Bell (Plaintiff's Exhibit D, "Levy Guaranty"). Levy is a shareholder of both Romaine and Market, employed as President of Market, and Chairman of Romaine (Defendant's Exhibit A, Affidavit of John Levy at ¶¶ 4, 6).

By August 3, 2005, Bell had still not received significant payment from Market for Bell products in part due to problems with MFB Financial ("the bank"), which was another of Market's creditors (Uranga Aff. at ¶ 11). The bank and Bell reached an agreement, known as the Intercreditor Agreement, for the benefit of Market (Bell Exhibit B, "Intercreditor Agreement"). Under the Intercreditor Agreement between Bell and the bank, Bell would receive money from a Market account, and Bell agreed to provide ongoing financing for Market orders. Attached to the Intercreditor Agreement was a "Consent and Release" agreement signed by John Levy on behalf of Market, Romaine, and himself, in which all three consented to the Intercreditor

Agreement and discharged the bank and Bell from any and all claims which related to Market's prior debt to those entities (Intercreditor Agreement, last page).

On August 18, 2005, Bell and Market entered into another contract titled "Remittance Agreement" (Bell Exhibit F "Remittance Agreement).  Under the Remittance Agreement, the parties basically agreed to the same terms as the Lockbox Agreement from June 17, 2004. However, the Remittance Agreement had more detailed instructions as to how Bell would receive payments for orders from Market customers (Remittance Agreement at 2).

From August 2005 until early 2006, Market submitted several orders to Bell, which for the most part Bell rejected (Levy Aff. at ¶ 40-42).

B.     Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Lawson v. CSX Transp., Inc., 245 F.3d 916, 922 (7th Cir. 2001).  In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party as well to draw all reasonable and justifiable inferences in favor of that party.  Anderson, 477 U.S. at 255; King v. Preferred Technical Group, 166 F.3d 887, 890 (7th Cir. 1999).  To overcome a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in its pleadings.  Rather, the non-moving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-23 (1986); Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000).  Where a factual record taken

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Bank of Ariz. v. Cities Services Co., 391 U.S. 253, 289 (1968)).

      C.      Bell's Motion for Summary Judgment

            1.      Breach of Contract Claims

Bell in its Complaint claims that Market breached its contract because Market never provided Bell with  payment for approximately nine million dollars in Bell products.  Market counterclaims by alleging Bell breached its contract by not filling certain orders that Market provided to Bell.  Bell has moved for summary judgment on both its claim and Market's counterclaim.  To resolve these claims, this Court must examine the parties' responsibilities under the contract.

The overriding goal of contract interpretation is to give effect to the parties' mutual intentions at the time of contracting.  Amtower v. Photon Dynamics, Inc., 71 Cal. Rptr. 3d 361, 382 (Cal. Ct. App. 2008).  When the contract language is clear and explicit and does not lead to absurd results, this Court ascertains intent from the written terms and goes no further.  Shaw v. Regents of Univ. of Calif., 67 Cal. Rptr. 2d 850, 855 (Cal. Ct. App. 1997).  When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the other party.  Dore v. Arnold Worldwide, Inc., 46 Cal. Rptr.3d 668, 674 (Cal. 2006).  A court provisionally receives all credible evidence concerning the parties' intentions to determine whether the language is "reasonably susceptible" to the interpretation urged by a party.  Wolf v. Superior Court, 8 Cal.

Rptr. 3d 649, 656 (Cal. Ct. App. 2004) (citations omitted).  Only if the extrinsic evidence reveals

that an ambiguity exists is the extrinsic evidence admitted to aid in interpreting the contract.  Id.

First, both of the contracts provide:

Reseller Obligations. [Market] agrees, that notwithstanding the terms of this
Agreement:

> A.      [Market] is liable to Bell for full payment of any outstanding Bell
>         invoice to [Market] . . . regardless of whether or not Customer(s) has
>         made partial or full payment on [Market]'s invoice, and
> B.      [Market] remains solely responsible for the collection of any sums
>         due and owing to [Market].

(Lockbox Agreement and Remittance Agreement ¶ 4).  Consequently, the written language

clearly indicates that Market remains liable for any balance on products provided by Bell.

Market does not dispute that there is a balance for Bell products and that it must pay for those

products.  However, Market argues that Bell also breached the contract between the parties,

which absolves Market from its breach of the contract.  Specifically, Market argues that Bell

improperly failed to fill certain orders provided to Bell by Market.  Market's argument springs

from the language of  the Lockbox and Remittance Agreements and from the Intercreditor

Agreement.  Both the Lockbox Agreement and the Remittance Agreement contain the following

language:

Purchase Orders. [Market] will submit a written purchase order for Bell products
from Customer(s) **for approval by Bell** (a "Purchase Order").

> 1.1 If Bell, **in its sole and absolute discretion**, determines that a Purchase
> Order will be subject to the terms of this Agreement, Bell will so advise
> [Market]; will after satisfaction of all conditions in Section 1 hereof, will ship
> Bell Products to the Customer(s); and will invoice [Market] for the Bell
> Products shipped pursuant to the Purchase Order.

(Lockbox Agreement and Remittance Agreement ¶ 1) (emphasis added).  This language is certainly not ambiguous.  In fact, it is hard to imagine language that would be any clearer.  This language gives Bell the right to determine in its discretion whether to accept or reject an order from Market.  However, despite the clarity of this language, California law requires this Court to consider the extrinsic evidence Market has offered to determine whether the contract language is none the less ambiguous.

Market submits the affidavit from Levy as such extrinsic evidence.  In it Levy claims that Bell historically filled every order submitted by Market regardless of the form of payment.  For example, Bell would fill orders for Market customers that paid on a net 30 basis or by credit.  However, Levy claims that from mid 2004 through 2006 Bell began rejecting orders based on the form of payment.  Specifically, Bell would not accept net 30 or credit payments.  In other words, Levy claims that Market was under the belief that Bell would fill orders based on some sort of historical practice.

This extrinsic evidence, however, fails to establish that the explicit language from the contract, that Bell had "sole and absolute discretion" to fill an order, is ambiguous.  Even if Bell chose to change its previous practice regarding the customers' form of payment, and even though Market may have been confused by this change in practice, that does not change the clear and unambiguous terms of the contract.  Additionally, Market does not point to other language in the contract that contradicts the language which gives Bell sole and absolute discretion when and how to fill orders.  Nor has Market established that the language of "absolute and sole discretion" is susceptible, let alone reasonably susceptible, to some other definition.  Simply put, if Bell suddenly changed how it elected to use its discretion when accepting or rejecting orders,

this change does not constitute a breach of the contract, because the language of the contract explicitly granted Bell the right to use its "sole and absolute discretion" to do so.

In summary, Market has failed to establish a genuine issue of material fact as to the contract between Bell and Market.  Market does not deny that it owes Bell money for products it received.  And Market has not submitted sufficient evidence to create a genuine issue of material fact regarding whether the contract language of the Bell/Market contract is ambiguous.

Market also points to the Intercreditor Agreement as a basis for Bell's liability. Paragraph ten of the Intercreditor Agreement contains the following language:

> Bell has agreed to provide ongoing financing for the operation of Market by providing product on credit to Market in order to enable Market to fill certain orders. . . . Bell shall not be obligated to provide any amount of product on credit to Market. However, if Bell does not provide $400,000.00 of product on credit to Market per month, Bank shall be entitled to terminate the Forbearance Period.

Market argues that this language bound Bell to provide Market with at least $400,000 worth of products to fill Market orders, which Bell did not do.

Before interpreting the Intercreditor Agreement, this Court acknowledges that the Agreement contained a separate choice of law provision than all of the other contracts in this case.  However, the Intercreditor Agreement was a contract between Bell and the bank to resolve any financial disputes regarding continued business with Market.  Market was not a party to the contract.  Instead, Market was only a third party beneficiary.[1]  A third party beneficiary is a non-member to a contract who may enforce a contract.  See City of East Chi. v. East Chi. Second Century, Inc., 878 N.E.2d 358, 374 (Ind. Ct. App. 2007).  Because the Intercreditor Agreement was a separate contract, the choice of law clause is applicable as to only this particular contract.

---

[1]Bell admits that Market was a third party beneficiary for purposes of summary judgment.

Therefore, this Court will apply Indiana law in analyzing Market's rights pursuant to that document.

In Indiana the interpretation and construction of contract provisions is a function for the courts. Klitz v. Klitz, 708 N.E.2d 600, 602 (Ind. Ct. App. 1999). In interpreting an unambiguous contract, a court gives effect to the parties' intentions as expressed in the four corners of the document. Noble Roman's, Inc. v. Pizza Boxes, Inc., 835 N.E.2d 1094, 1098 (Ind. Ct. App. 2005). Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning. Id. Whether a contract is ambiguous is a question of law. W. Ohio Pizza, Inc. v. Clark Oil & Refining Corp. 704 N.E.2d 1086, 1091 (Ind. Ct. App. 1999). Where the terms of a contract are clear and unambiguous, they are conclusive and a court will not construe the contract or consider extrinsic evidence. Eckart v. Davis, 631 N.E.2d 494, 497 (Ind. Ct. App. 1994). A contract is not ambiguous merely because the parties disagree about the proper interpretation of its terms. Arrotin Plastic Materials of Ind. v. Wilmington Paper Corp., 865 N.E.2d 1039, 1041 (Ind. Ct. App. 2007). In fact, a contract is only ambiguous where a reasonable person could find that its terms are susceptible to more than one interpretation. Id. If a contract is uncertain and its meaning is to be determined by extrinsic evidence, its construction is for the finder of fact. Schoemer v. Hanes & Assoc.s, Inc., 693 N.E.2d 1333, 1338-39 (Ind. Ct. App. 1998).

Market argues that the Intercreditor Agreement is ambiguous because paragraph 10 contains contradictory language. Specifically, the Intercreditor Agreement states "Bell has agreed to provide ongoing financing for the operation of Market by providing product on credit to Market," but the very next sentence of the Intercreditor Agreement states "Bell shall not be

obligated to provide any amount of product on credit to Market." Therefore, Market argues that the Intercreditor Agreement states that Market will provide Bell with financing but that Market does not have to provide Market with financing.

This Court finds that the language is not ambiguous, but rather, is harmonious. The first part of paragraph 10 indicates that Bell will provide financing to Market, and the next sentence simply clarifies that Bell does not have an obligation to provide a set amount of financing. In other words, the benefit to Market was that Bell would continue to do business with Market, but Bell did not bind itself to a set or minimum amount of business.

The parties do not dispute that Bell provided some financing to Market after the Intercreditor Agreement, but Market claims that the amount financed was not enough. Market points to the $400,000 dollar paragraph of the contract as a basis for a floor of financing Bell had to provide Market. The $400,000 dollar figure cannot be isolated from the language surrounding it. The paragraph gave the bank the right to terminate the Forbearance Period if Bell did not provide Market at least $400,000 dollars in financing.[2] The section regarding a minimum supply of $400,000 was a benefit conferred to the bank. The Forbearance period was simply a period of time that the bank agreed not to take any collection actions for the debt Market owed to the bank. Bell's failure to provide $400,000 simply gave the bank the right to take action before the end of the Forbearance period. The duty on Bell to the benefit of Market was to continue doing business with Market, but the clause regarding $400,000 did not bind Bell to conducting a set amount of business to the benefit of Market.

---

[2] The "Forbearance Period" was just a period of time from the date of the Intercreditor Agreement until November 3, 2005 (Intercreditor Agreement at ¶ 5).

In summary, because Bell had sole discretion to reject any Market order and the Intercreditor Agreement did not require Bell to do a minimum amount of business with Market, Market has failed to show that the contract between Market and Bell was ambiguous or that it did not breach the contract.  As a consequence, Bell's motion for summary judgment is **GRANTED** regarding Bell's breach of contract claims against Market and regarding Market's breach of contract counterclaim against Bell.

        3.      <u>Breach of Warranties</u>

Market alleges that Bell failed to accept returns of certain defective merchandise, and as a result, is entitled to set-off of part of the account balance Market owes to Bell.  Bell's return policy provides:

> **<u>RETURNS POLICY</u>**
> **Standard Returns**
> All sales are considered final. In the event an error has occurred on the part of [Bell], an RMA must be requested through you[r] Sales Representative and approved by Management. Requests for convenience returns should also be requested through your Sales Representative. These requests must be approved by management and may incur a restocking fee.
> **Defective/DOA Returns** Product found to be defective within 30 days of the invoice date is considered DOA and can be returned for credit or new product. For product found to be defective outside the 30 day DOA period, the returns policy of the manufacturer will be followed. Depending on the product, the return may need to be processed directly through the manufacturer. To request an RMA or verify warranty status on a defective/DOA unit, contact our Customer Service Department at (408)451-1645. Bell Microproducts may require test or diagnostic results in order to process your request.
> **\*\* All returns must have an authorized [Bell] RMA label attached to the outside of the package. Returns without this label will be refused.**
> **\*\* If product is returned to a warehouse other than the address that is printed on the RMA label, it will be returned to the customer**

(Bell Exhibit E).  Bell claims that pursuant to this return policy, all defective products had to be returned to Bell.  Because Market admits it still has some of the defective products in its possession, Bell claims Market admits it has not complied with Bell's return policy that the defective products be returned in thirty days.  As a result, Bell claims it is entitled to summary judgment on the warranty issues.

While Market still possesses the defective products, that fact does not entitle Bell to summary judgment.  The warranty provides a procedure to handle defective products submitted after the thirty day requirement.  More specifically, the return policy indicates that the return policy of the manufacturers will be followed if Market contacted Bell to determine the applicability of the manufacturer warranty.  Market argues that they attempted to process the warranties of the manufacturers' through Bell, but Bell refused to process them (Levy Aff. ¶ 31). Bell retorts that it processed each "properly submitted" return regarding manufacturer warranties (Uranga Aff. ¶ 21).

This Court does not have the manufacturer warranties before it; as a result, this Court can only speculate whether Bell had duties regarding the manufacturer warranties and, if so, what those duties were.  Furthermore, this Court does not have any written evidence that indicates Bell rejected some returns by Market.  The only evidence before this Court regarding the returns is two affidavits, one from Bell's representative, Uranga, and one from Market's representative, Levy.  This Court cannot give weight to one affidavit over another, or find one affidavit more credible than another, in an attempt to resolve the conflict.  See Wilson v. Williams, 997 F.2d 348, 350 (7th Cir. 1993).  Consequently, this Court cannot resolve whether Market in fact contacted Bell regarding certain products, what constitutes a "proper submission," and whether

Bell in fact rejected some of Market's submission legitimately if at all.  Bell's motion as it pertains to the breach of the returns policy or warranties is **DENIED**.

        4.    <u>The Guaranties</u>

Romaine and Levy signed guaranties regarding the debt Market owed to Bell.  Bell has moved for summary judgment regarding the liability as to both the Romaine Guaranty and the Levy Guaranty.  This Court will address each guaranty in turn.

        a.    Romaine Guaranty

Romaine raises only one argument to avoid the terms of the guaranty, which is that there was a lack of consideration for its guaranty.  But as this Court has previously held, because Romaine failed to plead the affirmative defense of lack of consideration in it answer this argument was **WAIVED**.  Therefore, because Romaine has not properly raised any affirmative defense, Bell's motion for summary judgment regarding Romaine's liability based on the Romaine Guaranty is essentially uncontested and must be **GRANTED**.

        b.    Levy Guaranty

Unlike Romaine, Levy did plead the affirmative defense of lack of consideration.  Under California law whether there is sufficient consideration is a question of fact for the jury to determine.  <u>Sharman v. Longo</u>, 58 Cal. Rptr. 79, 82 (Cal. Ct. App. 1967); <u>Rusk v. Johnston</u>, 63 P.2d 1167 (Cal. Ct. App. 1937); <u>In re Thomson's Estate</u>, 131 P. 1045, 1048 (Cal. 1913).

Levy points to the uncontroverted fact that his guaranty was not signed contemporaneously with any written contract.  Under California law, when a guaranty and principal obligation are entered into contemporaneously, consideration for the principal obligation also forms consideration for the guaranty.  <u>See</u> Cal. Civ. Code § 2792; <u>Rancho Santa</u>

Fe Pharmacy, Inc. v. Seyfert, 268 Cal. Rptr. 505, 506 (Cal. Ct. App. 1990); Niederer v. Ferreira, 234 Cal. Rptr. 779, 790 (Cal. Ct. App. 1987).  However, a guaranty made after the primary agreement has been executed and the consideration supporting it has passed requires a new consideration. Cal. Civ. Code § 2792; Oakland Bank of Commerce v. Wash., 86 Cal. Rptr. 276, 278 (Cal. Ct. App. 1970).  But if the express language of the guaranty indicates it applies to former and current obligations, the guaranty will extend to the earlier loans so long as proper consideration is given at the time the guaranty is made.  Beverly Hills Nat. Bank v. Glynn, 73 Cal. Rptr. 808, 813 (Cal. Ct. App. 1968); see also Kafka v. Bellevue Corp., 999 F.2d 1117, 1124 (7th Cir. 1993).

The Levy Guaranty states,

[Levy] hereby unconditionally guarantees the payment when due of all of [Market's] indebtedness now or hereafter owed to Bell. . . . The term "indebtedness" shall include every payment obligation which [Market] has or may have to Bell; regardless of the form thereof and whenever due.

(Levy Guaranty at ¶ 1). Consequently, the language of the Levy Guaranty clearly indicates that future obligations will be incurred as well as previous obligations.

However, it is undisputed that the Levy Guaranty was signed at some point in November 2004; yet, it is equally undisputed that the Lockbox Agreement was created on June 14, 2004. Consequently, the Levy Guaranty was not signed contemporaneously with the Lockbox Agreement.  In fact, all of the written documents that are or could be construed as contracts were created several months before the Levy Guaranty.  Even copies of individual purchase orders Levy submitted are dated from June 2004 (Levy Aff. at 12-16).  Bell has not offered any other documents that establishes there was a written contract created in November 2004 when the Levy Guaranty was created.  Consequently, because none of the written contracts were created

contemporaneously with the Levy Guaranty, the law of Cal. Civ. Code § 2792 is inapplicable to the Levy Guaranty.[3]

However, when there is a written instrument, such as the Levy Guaranty, there is a presumption that consideration was exchanged. Cal. Civ. Code § 1614. Despite this presumption, Bell maintains the burden of proof regarding consideration, and Levy simply has the burden of production. Rancho Santa Fe Pharmacy, Inc., 268 Cal. Rptr. at 506.

> When the party against whom . . . a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor it initially worked to prove the fact in question.

Id. at 509.

If Levy had submitted nothing to refute Bell's claim or to overcome the presumptions, Bell would be entitled to summary judgment. But such is not the case. The Levy Guaranty states:

> "[i]n consideration of the credit [Bell] has extended or may extend to [Romaine] and [Market] and for other valuable consideration"

(Levy Guaranty at ¶ 1). Levy claims that the credit that is the presumptive consideration for his guaranty had already been extended to Market through previous purchase orders. Either these purchase orders were separate contracts in which Bell extended Market credit in exchange for Market's financial liability for that credit, or the credit was already extended pursuant to the Lockbox Agreement. As proof of this claim, Levy submits purchase orders to Bell from Market for products that pre-date the Levy Guaranty by several months. While the purchase orders do not establish that the credit spoken of in the Levy Guaranty had already been given, the purchase

---

[3]The parties may have orally entered into a contract at the time the guaranty was signed, but whether there was a valid offer, acceptance, and consideration for such a contract is a question of fact for the jury.

orders do raise a question of fact as to whether the credit given is in fact past consideration, or whether Bell gave some other form of consideration.  Consequently, Levy has produced sufficient evidence to rebut the presumption that adequate consideration was exchanged.

Bell claims that Levy's reliance on the purchase orders does not create a genuine issue of fact because they are not contracts.  Bell argues that the purchase orders violate the statute of frauds, and as a consequence, cannot be contracts that are the basis for past consideration.

Pursuant to California's statute of frauds,

> a contract for the sale of goods for the price of five hundred dollars . . . or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

Cal. Com. Code § 2201(1).  Bell does not dispute that the purchase orders constitute a writing, but claims that they lack a signature from a Bell agent to satisfy the statute of frauds.

However, the statute of frauds has several exceptions.  See Cal. Com. Code § 2201(2)-(4); 1 White & Summers, Uniform Commercial Code § 2-5 (5th Ed. ).  For one, the statute of frauds is not both a shield and a sword.  Moore v. Day, 266 P.2d 51, 53 (Cal. Ct. App. 1954). That is to say, a party cannot admit in court that a contract exists and still treat the statute as a defense.  See Cal. Com. Code § 2201(3)(b); see also generally  White & Summers, Uniform Commercial Code § 2-5.  Bell admitted in open court at the May 1, 2008, oral argument  that at some point the purchase orders were filled, but that they were not filled at the time it received the purchase orders.  Thus, Bell relies on those purchase orders as part of its basis for its breach of contract theory against Market, yet Bell seeks to assert the statute of frauds as a defense when Levy points to those purchase orders as a basis for his lack of consideration defense.  The purpose of the statute of frauds is to prevent the enforcement of alleged promises that were never

18

made.  Lockwood v. Smigel, 96 Cal. Rptr. 289, 291 (Cal. Ct. App. 1971).  The contracts that resulted from the purchase orders when Bell did fill them were either void under the statute of frauds or they were valid and enforceable because they were outside the statute.  In other words, if the statute of frauds applies, the entire contract is void and Bell could not then allege that a valid contract existed that Market breached.[4]   Bell may be correct that the parties did not have a contract at the time Bell received the purchase orders for a variety of reasons, but that question is one for the jury.  See Guzman v. Visalia Cmty Bank, 84 Cal. Rptr. 2d 581, 584-85 (Cal. Ct. App. 1999) ("The interpretation of the purported acceptance or rejection of an offer is a question of fact.").  However, the purchase orders were not invalid as a matter of law pursuant to the statute of frauds, and as a result, Levy appropriately relies on them as evidence that the consideration for his guaranty was past consideration.

Finally, this Court also notes that summary judgment is not appropriate regarding Levy's second affirmative defense of economic duress.  Economic duress may occur when a party commits some "wrongful act" that is sufficiently coercive to cause a reasonably prudent person face with no reasonable alternative to succumb to the perpetrator's pressure.  Perez v. Uline, Inc., 68 Cal. Rptr. 3d 872, 876 (Cal. Ct. App. 2007).  Levy claims that the wrongful act that Bell committed was that it first accepted the purchase orders from June of 2004, but then later indicated that it would not honor those contracts unless Levy signed a guaranty.  Bell again stresses that the purchase orders were not contracts, and as a result, its refusal to honor the purchase orders absent a guaranty from Levy is not a wrongful act.  Simply put, this Court can

---

[4]This Court also notes under Cal. Com. Code § 2201(3)(c), even if a contract violates the statute of frauds, it is valid and enforceable if goods have been received and accepted.  The parties do not dispute that at some point, Market accepted goods from Bell based on the purchase orders.  Therefore, at some point, the contract that constitutes the purchase orders were outside the statute of frauds.

also not resolve this issue because the same questions of fact regarding the lack of consideration issue are ambient with the economic duress issue.  In other words, whether there was consideration with the purchase orders or an acceptance of the purchase orders are questions of fact for the jury, and Levy's economic duress theory depends upon the resolution of such threshold questions.

In summary, Cal. Civ. Code § 2792 is inapplicable.  Levy has produced some evidence of purchase orders to rebut the presumption of Cal. Civ. Code § 1614.  The statute of frauds does not invalidate the purchase orders.  Therefore, the question still remains whether the credit extended to Market was sufficient consideration to support the Levy Guaranty or whether it was insufficient as past consideration.  Under California law, the adequacy of consideration is a question of fact, and whether Levy signed the guaranty under economic duress is predicated upon the same questions of fact.  As a result, Bell's motion for summary judgment as to the Levy Guaranty is **DENIED**.

### 5.   Tortious Interference with a Business Relationship

Market had business relationships with other companies.  These companies had requested products from Market, so Market requested the products it needed from Bell to fill these orders. Market claims that Bell deliberately choose not to fill the orders and knew of Market's business relationship with these other companies.  Consequently, Market's final claim is that Bell committed the tort of interference with a business relationship when it deliberately chose not to fill some of Market's orders.

The elements for tortious interference with a business relationship are:1) the existence of a valid relationship; 2) the defendant knew of the existence of the relationship; 3) the defendant

intentionally interfered with that relationship; 4) the absence of justification; and 5) damages resulting from the defendant's wrongful interference.  Gov't Payment Serv., Inc. v. Ace Bail Bonds, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006).  Tortious interference with a business relationship also requires some independent illegal act.  Brazauskas v. Fort Wayne-South Bend Diocese, Inc., 796 N.E.2d 286, 291 (Ind. 2003).

Bell argues that it has not committed an illegal act and that Market has not submitted any evidence that Bell committed an illegal act.  As a result, Bell argues it is entitled to summary judgment on this claim.  Market does not claim that Bell committed any civil or criminal statutory violation.  Instead, Market vaguely alleges that Bell had "ill intent" when it did not fill some of Market's purchase orders.  However, Bell submits no evidence to corroborate that Bell had ill intent or to even raise a question of whether Bell had ill intent.  The only thing Bell submits is the affidavit of Levy, which outlines Levy's subjective belief that Bell had ill intent.  This evidence, at best, is speculative evidence that Bell committed an illegal act.  Market is required to present evidence creating a reasonable inference, not merely a possibility.  See Jenkins v. Heintz, 124 F.3d 824, 831 (7th Cir. 1997).  Under the Fed. R. Civ. P. 56 standard for summary judgment, producing speculative evidence and nothing more is not sufficient to survive summary judgment.  E.g., Moser v. Ind. Dep't of Corrections, 406 F.3d 895, 905 (7th Cir. 2005) (indicating speculation or metaphysical doubt is insufficient to survive summary judgment); Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000) ("The party must supply evidence sufficient to allow a jury to render a verdict in his favor.").

Consequently, because Market has failed to produce sufficient evidence that Bell committed an illegal act, Bell's motion for summary judgment regarding Market's claim for tortious interference with a business relationship is **GRANTED**.

6.      Damages

Bell claims that it is entitled to $9,060,278.57 for Market's breach of the contract between the parties.  However, this Court cannot make a finding regarding the final amount of the judgment because this figure may be lower depending on how the jury resolves the questions of fact regarding the warranties.  Consequently, Market's motion for summary judgment as to damages is **DENIED**.

**V.      CONCLUSION**

Bell's motion to strike is **GRANTED** [Doc. No. 44].  Bell's motion for summary judgment is **GRANTED IN PART** & **DENIED IN PART** [Doc. No. 40].  Bell's motion with regards to its claims that Market breached its contract and that Romaine breached its guaranty, as well as to Market's counterclaims that Bell did not breach its contract and that Bell did not commit tortious interference with a business relationship, is **GRANTED**.  As a result, no trial is needed with regards to Market and Romaine's liability.  However, because Bell's motion with regards to the Levy Guaranty is **DENIED**, a jury trial question remains as to the adequacy of consideration and economic duress for Levy's liability.

Finally, even though Market and Romaine are liable to Bell, a question remains as to the exact amount of damages owed because Bell's motion regarding Market's breach of warranty issues is also **DENIED**.

Therefore, the only issues for the jury to resolve will be liability as to Levy, and the exact amount of damages owed to Bell from Market, Romaine, and possibly Levy.

**SO ORDERED.**

Dated this 14th Day of May, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge